1 | **CAREY D. GORDEN**
California State Bar No. 236251
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, CA 92101-5030
(619) 234-8467/Fax: (619) 687-2666
4 | E-Mail: carey_gorden@fd.org

5 | Attorneys for Mr. Juan Antonio Ramirez-Lozano

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE WILLIAM Q. HAYES)**

11 | UNITED STATES OF AMERICA,                )    Case No. 08CR0801-WQH
                                             )
12 |            Plaintiff,                    )
                                             )    STATEMENT   OF   FACTS   AND
13 | v.                                       )    MEMORANDUM   OF   POINTS   AND
                                             )    AUTHORITIES   IN   SUPPORT   OF
14 | **JUAN ANTONIO RAMIREZ-LOZANO**,          )    DEFENDANT'S MOTIONS
                                             )
15 |            Defendant.                    )
                                             )
16 | _____)

17 | **I.**

18 | **STATEMENT OF FACTS**[1]

19 |        On February 21, 2008 at approximately 9:50 a.m., Mr. Ramirez-Lozano was apprehended

20 | in the brush near the San Clemente Borer Patrol Checkpoint. Mr. Ramirez-Lozano was subsequently

21 | arrested.

22 |        On March 19, 2008, the government charged Mr. Ramirez-Lozano by way of indictment with

23 | one count of violating 8 U.S.C. § 1324(a)(1)(A)(ii) (transportation of illegal aliens), and one count

24 | of violating 8 U.S.C. § 1326(a) and (b)(deported alien found in the United States). The July 2007

25

26

27

28 |    _____
       [1] Unless otherwise stated, the "facts" referenced in these papers come from government-produced discovery that the defense continues to investigate. Mr. Ramirez-Lozano does not admit the accuracy of this information and reserves the right to challenge it at any time.

1    grand jury indicted Mr. Ramirez-Lozano. Mr. Ramirez-Lozano has pled not guilty to all counts and
2    charges.

3        These motions follow.

**II.**

**MOTION TO COMPEL DISCOVERY**

6        Mr. Ramirez-Lozano requests the following discovery. His request is not limited to those
7    items of which the prosecutor is aware. It includes all discovery listed below that is in the custody,
8    control, care, or knowledge of any "closely related investigative [or other] agencies." See
9    United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

10        1.    The Defendant's Statements. The government must disclose to Mr. Ramirez-Lozano
11    *all* copies of any written or recorded statements made by him; the substance of any statements made
12    by Mr. Ramirez-Lozano  that the government intends to offer in evidence at trial; any response by
13    him to interrogation; the substance of any oral statements that the government intends to introduce
14    at trial and any written summaries of his oral statements contained in the handwritten notes of the
15    government agent; any response to any Miranda warnings that may have been given to him; and any
16    other statements by him. Fed. R. Crim. P. 16(a)(1)(A) and (B). The Advisory Committee Notes and
17    the 1991 amendments to Rule 16 make clear that the government must reveal *all* of Mr. Ramirez-
18    Lozano's statements, whether oral or written, regardless of whether the government intends to make
19    any use of those statements.

20        2.    Arrest Reports, Notes and Dispatch Tapes. Mr. Ramirez-Lozano also specifically
21    requests that all arrest reports, notes and dispatch or any other tapes that relate to the circumstances
22    surrounding his arrest or any questioning, if such reports have not already been produced *in their*
23    *entirety*, be turned over to him. This request includes, but is not limited to, any rough notes, records,
24    reports, transcripts or other documents in which statements of Mr. Ramirez-Lozano or any other
25    discoverable material is contained. This is all discoverable under Fed. R. Crim. P. 16(a)(1)(A) and
26    (B) and Brady v. Maryland, 373 U.S. 83 (1963). See also Loux v. United States, 389 F.2d 911 (9th
27    Cir. 1968). Arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn
28    statements, and prosecution reports pertaining to Mr. Ramirez-Lozano are available under Fed. R.

1   Crim. P. 16(a)(1)(A) and (B), Fed. R. Crim. P. 26.2 and 12(I). Preservation of rough notes is
2   requested, whether or not the government deems them discoverable.

3       3.  <u>Brady Material</u>.  Mr. Ramirez-Lozano requests all documents, statements, agents'
4   reports, and tangible evidence favorable to him on the issue of guilt and/or that affects the credibility
5   of the government's case.  Impeachment and exculpatory evidence both fall within <u>Brady's</u> definition
6   of evidence favorable to the accused.  <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States
7   v. Agurs</u>, 427 U.S. 97 (1976).

8       4.  <u>Any Information That May Result in a Lower Sentence</u>.  As discussed above, any
9   information that may result in a more favorable sentence must also be disclosed pursuant to <u>Brady</u>,
10  373 U.S. 83.  The government must disclose any cooperation or attempted cooperation by Mr.
11  Ramirez-Lozano, as well as any information that could affect any base offense level or specific
12  offense characteristic under Chapter Two of the United States Sentencing Commission Guidelines
13  Manual ("Guidelines").  Also included in this request is any information relevant to a Chapter Three
14  adjustment, a determination of Mr. Ramirez-Lozano's criminal history, or any other application of
15  the Guidelines.

16      5.  <u>The Defendant's Prior Record</u>.  Evidence of a prior record is available under
17  Fed. R. Crim. P. 16(a)(1)(D).  Mr. Ramirez-Lozano specifically requests a complete copy of any
18  criminal record.

19      6.  <u>Any Proposed 404(b) Evidence</u>.  Evidence of prior similar acts is discoverable under
20  Fed. R. Crim. P. 16(a)(1)(D) and Fed. R. Evid. 404(b) and 609.  In addition, under
21  Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable
22  notice in advance of trial . . . of the general nature . . . ." of any evidence the government proposes
23  to introduce under Fed. R. Evid. 404(b) at trial.  Sufficient notice requires the government to
24  "articulate *precisely* the evidential hypothesis by which a fact of consequence may be inferred from
25  the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d 822, 830 (9th Cir. 1982) (emphasis
26  added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4 F.3d 1480, 1483
27  (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions).
28  / / /

1    This includes any "TECS" records (records of prior border crossings) that the government
2    intends to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there
3    is nothing intrinsically improper about prior border crossings, they are nonetheless subject to 404(b),
4    as they are "other acts" evidence that the government must produce before trial.  United States v.
5    Vega, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

6    Mr. Ramirez-Lozano requests that such notice be given *three weeks before trial* to give the
7    defense time to adequately investigate and prepare for trial.

8    7.    Evidence Seized.  Evidence seized as a result of any search, either warrantless or with
9    a warrant, is discoverable under Fed. R. Crim. P. 16(a)(1)(E).

10    8.    Request for Preservation of Evidence.  The defense specifically requests that all
11    **dispatch tapes** or any other physical evidence that may be destroyed, lost, or otherwise put out of
12    the possession, custody, or care of the government and that relate to the arrest or the events leading
13    to the arrest in this case be preserved.  This request includes, but is not limited to **vehicle involved**
14    **in the case**, **Mr. Ramirez-Lozano's personal effects, and any evidence seized from Mr.**
15    **Ramirez-Lozano or any third party**.  This request also includes any material or percipient
16    witnesses who might be deported or otherwise likely to become unavailable (e.g. undocumented
17    aliens and transients).

18    It is requested that the prosecutor be ordered to *question* all the agencies and individuals
19    involved in the prosecution and investigation of this case to determine if such evidence exists, and
20    if it does exist, to inform those parties to preserve any such evidence.

21    9.    Henthorn Material.  Mr. Ramirez-Lozano requests that the Assistant United States
22    Attorney ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel
23    files of each agent involved in the present case for impeachment material.  See Kyles v. Whitley, 514
24    U.S. 437, 438 (1995) (holding that "the individual prosecutor has a duty to learn of any favorable
25    evidence known to the others acting on the government's behalf in the case, including the police");
26    United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991).  This request includes, but is not limited to,
27    any complaints filed (by a member of the public, by another agent, or any other person) against the
28    agent, whether or not the investigating authority has taken any action, as well as any matter for which

1  a disciplinary review was undertaken, whether or not any disciplinary action was ultimately

2  recommended. Mr. Ramirez-Lozano further requests production of any such information at least *one*

3  *week* prior to the motion hearing and two weeks prior to trial.  If the prosecutor is uncertain whether

4  certain information should be disclosed pursuant to this request, this information should be produced

5  to the Court in advance of the motion hearing and the trial for an *in camera* inspection.

6       10.   <u>Tangible Objects</u>. Mr. Ramirez-Lozano requests the opportunity to inspect, copy, and

7  test, as necessary, all other documents and tangible objects, including photographs, books, papers,

8  documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof, that are

9  material to the defense or intended for use in the government's case-in-chief or were obtained from

10 or belong to Mr. Ramirez-Lozano. Fed. R. Crim. P. 16(a)(1)(E).  Specifically, Mr. Ramirez-Lozano

11 requests **color copies** of all photographs related to this case in the government's possession.

12      11.   <u>Expert Witnesses</u>.  Mr. Ramirez-Lozano requests the name, qualifications, and a

13 written summary of the testimony of any person that the government intends to call as an expert

14 witness during its case in chief.  Fed. R. Crim. P. 16(a)(1)(G).  This summary should include a

15 description of the witness' opinion(s), as well as the bases and the reasons for the opinion(s).  <u>See</u>

16 <u>United States v. W.R. Grace</u>, __ F.3d __, 2007 WL 2003307 *1, *9 (9th Cir., July 12, 2007); <u>United</u>

17 <u>States v. Duvall</u>, 272 F.3d 825 (7th Cir. 2001) (finding that government's written expert notice did

18 not adequately summarize or describe police detective's testimony in drug prosecution where notice

19 provided only a list of the general subject matters to be covered and failed to identify what opinion

20 the expert would offer on those subjects).  This request includes, but is not limited to, disclosure of

21 the qualifications of any government witness who will testify that he understands and/or speaks

22 Spanish or any other foreign language that may have been used during the course of an interview

23 with Mr. Ramirez-Lozano or any other witness.

24      Mr. Ramirez-Lozano requests the notice of expert testimony be provided at a minimum of

25 *three weeks prior to trial* so that the defense can properly prepare to address and respond to this

26 testimony, including obtaining its own expert and/or investigating the opinions, credentials of the

27 government's expert and obtain a hearing in advance of trial to determine the admissibility of

28 qualifications of any expert.  <u>See</u> <u>Kumho v. Carmichael Tire Co.</u>, 526 U.S. 137, 119 S. Ct. 1167,

1  1176 (1999) (trial judge is "gatekeeper" and must determine, reliability and relevancy of expert

2  testimony and such determinations may require "special briefing or other proceedings").

3      12.   Impeachment evidence.   Mr. Ramirez-Lozano requests any evidence that any

4  prospective government witness has engaged in any criminal act whether or not resulting in a

5  conviction and whether any witness has made a statement favorable to Mr. Ramirez-Lozano.  See

6  Fed. R. Evid. 608, 609 and 613.  Such evidence is discoverable under Brady, 373 U.S. 83.  See

7  United States v. Strifler, 851 F.2d 1197 (9th Cir. 1988) (witness' prior record); Thomas v. United

8  States, 343 F.2d 49 (9th Cir. 1965) (evidence that detracts from a witness' credibility).

9      13.   Evidence of Criminal Investigation of Any Government Witness.  Mr. Ramirez-Lozano

10 requests any evidence that any prospective witness is under investigation by federal, state or local

11 authorities for any criminal conduct.  United States v. Chitty, 760 F.2d 425 (2d Cir. 1985).

12     14.   Evidence of Bias or Motive to Lie.  Mr. Ramirez-Lozano requests any evidence that

13 any prospective government witness is biased or prejudiced against her, or has a motive to falsify

14 or distort his or her testimony.  Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Strifler, 851 F.2d 1197.

15 **To this end, Mr. Ramirez-Lozano requests discovery regarding the material witness's prior**

16 **border apprehensions/contacts and any other potential impeachment information regarding**

17 **this witness.**

18     15.   Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity.

19 Mr. Ramirez-Lozano requests any evidence, including any medical or psychiatric report or

20 evaluation, tending to show that any prospective witness's ability to perceive, remember,

21 communicate, or tell the truth is impaired; and any evidence that a witness has ever used narcotics

22 or other controlled substance,

23 or has ever been an alcoholic.  Strifler, 851 F.2d 1197; Chavis v. North Carolina, 637 F.2d 213, 224

24 (4th Cir. 1980).

25     16.   Witness Addresses.  Mr. Ramirez-Lozano requests the name and last known address

26 of each prospective government witness.  See United States v. Napue, 834 F.2d 1311 (7th Cir. 1987);

27 United States v. Tucker, 716 F.2d 576 (9th Cir. 1983) (failure to interview government witnesses

28 by counsel is ineffective); United States v. Cook, 608 F.2d 1175, 1181 (9th Cir. 1979) (defense has

1  equal right to talk to witnesses).  Mr. Ramirez-Lozano also requests the name and last known address
2  of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance
3  thereof) who will *not* be called as a government witness.  United States v. Cadet, 727 F.2d 1453
4  (9th Cir. 1984).

5       17.  Name of Witnesses Favorable to the Defendant.  Mr. Ramirez-Lozano requests the
6  name of any witness who made any arguably favorable statement concerning him or who could not
7  identify him or who was unsure of his identity or participation in the crime charged.  Jackson v.
8  Wainwright, 390 F.2d 288 (5th Cir. 1968); Chavis, 637 F.2d at 223; Jones v. Jago, 575 F.2d
9  1164,1168 (6th Cir. 1978); Hudson v. Blackburn, 601 F.2d 785 (5th Cir. 1979), cert. denied, 444
10 U.S. 1086 (1980).

11      18.  Statements Relevant to the Defense.  Mr. Ramirez-Lozano requests disclosure of any
12 statement that may be "relevant to any possible defense or contention" that he might assert.  United
13 States v. Bailleaux, 685 F.2d 1105 (9th Cir. 1982). **This includes grand jury transcripts that are**
14 **relevant to the defense motion to dismiss the indictment.**

15      19.  Jencks Act Material.  Mr. Ramirez-Lozano requests production in advance of the
16 motion hearing or trial of all material, including dispatch tapes, that the government must produce
17 pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.  A verbal acknowledgment
18 that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report
19 or notes to qualify as a statement under section 3500(e)(1).  Campbell v. United States, 373 U.S. 487,
20 490-92 (1963); see also United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that
21 interview notes constitutes Jencks material when an agent reviews notes with the subject of the
22 interview); see also United States v. Riley, 189 F.3d 802, 806-808 (9th Cir. 1999).  Advance
23 production will avoid the possibility of delay of the motion hearing or trial to allow Mr. Ramirez-
24 Lozano to investigate the Jencks material.  Mr. Ramirez-Lozano requests pre-trial disclosure of such
25 statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare for, and
26 use properly any Jencks statements during cross-examination.

27      20.  Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr.
28 Ramirez-Lozano requests all statements and/or promises, expressed or implied, made to any

1  government witnesses, in exchange for their testimony in this case, and all other information that

2  could arguably be used for the impeachment of any government witnesses.

3       21.  Agreements Between the Government and Witnesses.  Mr. Ramirez-Lozano requests

4  discovery regarding any express or implicit promise, understanding, offer of immunity, of past,

5  present, or future compensation, or any other kind of agreement or understanding, including any

6  implicit understanding relating to criminal or civil income tax, forfeiture or fine liability, between

7  any prospective government witness and the government (federal, state and/or local).  This request

8  also includes any discussion with a potential witness about or advice concerning any immigration

9  benefits, any contemplated prosecution, or any possible plea bargain, even if no bargain was made

10  or the advice not followed.

11       22.  Informants and Cooperating Witnesses.  Mr. Ramirez-Lozano requests disclosure of

12  the names and addresses of all informants or cooperating witnesses used or to be used in this case,

13  and in particular, disclosure of any informant who was a percipient witness in this case or otherwise

14  participated in the crime charged against Mr. Ramirez-Lozano.  The government must disclose the

15  informant's identity and location, as well as disclose the existence of any other percipient witness

16  unknown or unknowable to the defense.  Roviaro v. United States, 353 U.S. 52, 61-62 (1957).  The

17  government must disclose any information derived from informants that exculpates or tends to

18  exculpate Mr. Ramirez-Lozano.

19       23.  Bias by Informants or Cooperating Witnesses.  Mr. Ramirez-Lozano requests

20  disclosure of any information indicating bias on the part of any informant or cooperating witness.

21  Giglio, 405 U.S. 24.  Such information would include what, if any, inducements, favors, payments

22  or threats were made to the witness to secure cooperation with the authorities.

23       24.  Personnel Records of Government Officers Involved in the Arrest.  Mr. Ramirez-

24  Lozano requests all citizen complaints and other related internal affairs documents involving any of

25  the immigration officers or other law enforcement officers who were involved in the investigation,

26  arrest and interrogation of Mr. Ramirez-Lozano.  See Pitchess v. Superior Court, 11 Cal. 3d 531, 539

27  (1974).  Because of the sensitive nature of these documents, defense counsel will be unable to

28  procure them from any other source.

1    25.   Training of Relevant Law Enforcement Officers.  Mr. Ramirez-Lozano requests copies

2    of all written videotaped or otherwise recorded policies or training instructions or manuals issued

3    by all law enforcement agencies involved in the case (United States Customs Service, Border Patrol,

4    INS, Department of Homeland Security, etc.) to their employees regarding:   (a) the handling of

5    vehicles suspected to be transporting contraband across the port of entry; (b) the referral to secondary

6    inspection of persons within those vehicles; (c) the detention of individuals within those vehicles;

7    (d) the search of those vehicles and the occupants of those vehicles, including the proper means of

8    obtaining consent to search and what constitutes consent to search; (e) the informing of suspects of

9    their Constitutional rights; (f) the questioning of suspects and witnesses.  Mr. Ramirez-Lozano also

10   requests all written or otherwise attainable information regarding the training of Customs agents at

11   ports of entry in California to detect or discover contraband in vehicles entering the United States,

12   including any training offered to Border Patrol, INS, or officers of Homeland Security Department,

13   by the DEA or other law enforcement agencies or individuals.

14   26.   Performance Goals and Policy Awards.  Mr. Ramirez-Lozano requests disclosure of

15   information regarding standards used for measuring, compensating or reprimanding the conduct of

16   all law enforcement officers involved in the case (Customs, Border Patrol, INS, etc.) to the extent

17   such information relates to the detection of contraband.   This request specifically includes

18   information concerning performance goals, policy awards, and the standards used by Customs for

19   commending, demoting, or promoting agents for their performance at the port of entry and their

20   success or failure to detect illegal narcotics in general.

21   27.   TECS Reports.  Mr. Ramirez-Lozano requests TECs reports.  **Mr. Ramirez-Lozano**

22   **specifically requests any "TECS" records related to him, and the Ford Crown Victoria seized**

23   **in this case**.  **Any prior border crossings are considered "other acts" evidence which the**

24   **government must produce before trial**.  Vega, 188 F.3d at 1154.

25   28.   Reports of Scientific Tests or Examinations.  Pursuant to Fed. R. Crim. P. 16(a)(1)(F),

26   Mr. Ramirez-Lozano requests disclosure and the opportunity to inspect, copy, and photograph the

27   results and reports of all tests, examinations, and experiments conducted upon the evidence in this

28   case, including, but not limited to, any fingerprint testing done upon any evidence seized in this case,

1  that is within the possession, custody, or control of the government, the existence of which is known,

2  or by the exercise of due diligence may become known, to the attorney for the government, and that

3  are material to the preparation of the defense or are intended for use by the government as evidence

4  in chief at the trial.

5        29.  <u>Brady Information</u>.  The defendant requests all documents, statements, agents' reports,

6  and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the

7  credibility of the government's case.  Under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), impeachment

8  as well as exculpatory evidence falls within the definition of evidence favorable to the accused.

9  <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

10        30.  <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior

11  similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions

12  which would be used to impeach as noted in Fed. R. Crim. P. 609.  In addition, under

13  Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable

14  notice in advance of trial . . . of the general nature" of any evidence the government proposes to

15  introduce under Fed. R. Evid. 404(b) at trial.  The defendant requests notice two weeks before trial

16  to give the defense time to investigate and prepare for trial.

17        31.  <u>Specific Requests</u>.  Mr. Ramirez-Lozano specifically requests the opportunity to view

18  the "A-File" of the material witness in this case.  She also specifically requests all reports and

19  documentation relating to prior apprehensions of the material witness.

20        32.  <u>Residual Request</u>.  The defendant intends by this discovery motion to invoke his rights

21  to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the

22  Constitution and laws of the United States.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

08CR0801-WQH

**III.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. RAMIREZ-LOZANO OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury.  See CR at 6.[2]  That grand jury was instructed by Judge Burns on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[3]  These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[4]

**1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[5] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or

---

[1] "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB.

[2] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[3] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Mr. Arredondo-Ortiz requests that the video presentation be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[4] See also id. at 20 ("You're all about probable cause.").

1   not there should be a federal law or should not be a federal law designating certain activity [as]

2   criminal is not up to you." <u>See</u> <u>id</u>. at 8.  The instructions go beyond that, however, and tell the grand

3   jurors that, should "you disagree with that judgment made by Congress, then your option is not to

4   say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or

5   'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9.  Thus,

6   the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree

7   with a proposed prosecution.

8           Immediately before limiting the grand jurors' powers in the way just described, Judge Burns

9   referred to an instance in the grand juror selection process in which it excused three potential jurors.

10  <u>See</u> <u>id.</u> at 8.

11          I've gone over this with a couple of people.  You understood from the questions and
            answers that a couple of people were excused, I think three in this case, because they
12          could not adhere to the principle that I'm about to tell you.

13  <u>Id.</u>  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

14  disagreement with Congress.  <u>See</u> <u>id.</u> at 8-9.  Thus, the Court not only instructed the grand jurors on

15  its view of their discretion; it enforced that view on pain of being excused from service as a grand

16  juror.

17          Examination of the recently disclosed voir dire transcript, which contains additional

18  instructions and commentary in the form of the give and take between Judge Burns and various

19  prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine

20  whether or not probable cause exists and his statement that grand jurors they cannot judge the

21  wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of

22  instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge

23  Burns makes clear that the grand jury's sole function is probable cause determination.

24          [T]he grand jury is determining really two factors: "do we have a reasonable belief
            that a crime was committed?  And second, do we have a reasonable belief that the
25          person that they propose that we indict committed the crime?"

26          If the answer is "yes" to both of those, then the case should move forward.  If the
            answer to either of the questions is "no," then the grand jury should not hesitate and
27          not indict.

28  / / /

1  See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear

2  that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional

3  when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a

4  crime was committed" or if it has no "reasonable belief that the person that they propose that we

5  indict committed the crime."

6       Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated

7  that, in some unknown set of circumstances, they might decline to indict even where there was

8  probable cause.  Because of the redactions of the grand jurors' names, Mr. Arredondo-Ortiz will

9  refer to them by occupation.  One is a retired clinical social worker (hereinafter CSW), and the other

10  is a real estate agent (hereinafter REA).  The CSW indicated a view that no drugs should be

11  considered illegal and that some drug prosecutions were not an effective use of resources.  See id.

12  at 16.  The CSW was also troubled by certain unspecified immigration cases.  See id.

13       Judge Burns made no effort to determine what sorts of drug and immigration cases troubled

14  the CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually

15  filed in this district, such as drug smuggling cases and cases involving reentry after deportation and

16  alien smuggling.  Rather, Judge Burns provided instructions suggesting that, in any event, any

17  scruples CSW may have possessed were simply not capable of expression in the context of grand

18  jury service.

19       Now, the question is can you fairly evaluate [drug cases and immigration cases]?
         Just as the defendant is ultimately entitled to a fair trial and the person that's accused

20      is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too,
         is the United States entitled to a fair judgment.  If there's probable cause, then the

21      case should go forward.  *I wouldn't want you to say*, "well, yeah, there's probable
         cause, but I still don't like what our government is doing.  I disagree with these laws,

22      so I'm not going to vote for it to go forward."  If that is your frame of mind, the
         probably you shouldn't serve.  Only you can tell me that.

23

24  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let

25  the grand juror know that it would not want him or her to decline to indict in an individual case

26  where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there

27  was probable cause.  See id.  Such a case "should go forward."  See id.  Given that blanket

28  proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the

        08CR0801-WQH

1  CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence

2  warranted it." See id. Again, Judge Burns's question provided no context; it inquired regarding "a

3  case," a term presumably just as applicable to possession of a small amount of medical marijuana

4  as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this

5  exchange could only conclude that there was *no* case in which Judge Burns would permit them to

6  vote "no bill" in the face of a showing probable cause.

7        Just in case there may have been a grand juror that did not understand his or her inability to

8  exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange

9  with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and

10  federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address

11  REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply

12  forbidden from taking penalty considerations into account.

13            Well, those things -- the consequences of your determination shouldn't concern you
              in the sense that penalties or punishment, things like that -- we tell trial jurors, of
14            course, that they cannot consider the punishment or the consequence that Congress
              has set for these things. We'd ask you to also abide by that. We want you to make
15            a business-like decision of whether there was a probable cause. . . .

16  Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge

17  Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at

18  25.

19        In response to further questioning, REA disclosed REA's belief "that drugs should be legal."

20  See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an

21  instruction that a grand juror is obligated to vote to indict if there is probable cause.

22            I can tell you sometimes I don't agree with some of the legal decisions that are
              indicated that I have to make. But my alternative is to vote for someone different,
23            vote for someone that supports the policies I support and get the law changed. It's
              not for me to say, "well, I don't like it. So I'm not going to follow it here."
24
              You'd have a similar obligation as a grand juror even though you might have to grit
25            your teeth on some cases. Philosophically, if you were a member of congress, you'd
              vote against, for example, criminalizing marijuana. I don't know if that's it, but
26            you'd vote against criminalizing some drugs.

27            That's not what your prerogative is here. You're prerogative instead is to act like a
              judge and say, "all right. This is what I've to deal with objectively. Does it seem
28            to me that a crime was committed? Yes. Does it seem to me that this person's
              involved? It does. *And then your obligation, if you find those to be true, would be
              to vote in favor of the case going forward.*

1  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test,

2  which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

3         Having set forth the duty to indict, and being advised that REA was "uncomfortable" with

4  that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the

5  obligation to indict in every case in which there was probable cause.

6         The Court: Do you think you'd be inclined to let people go in drug cases even though
          you were convinced there was probable cause they committed a drug offense?
7         REA: It would depend on the case.
          The Court: Is there a chance that you would do that?
8         REA: Yes.
          The Court: I appreciate your answers.  I'll excuse you at this time.
9

10  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely

11  on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case,"

12  see id., as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that

13  REA would vote to indict in some (perhaps many or even nearly all) cases in which there was

14  probable cause.  Again, Judge Burns made no effort to explore REA's views; it did not ascertain

15  what sorts of cases would prompt REA to hesitate.  The message is clear: it does not matter what

16  type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the

17  "obligation" is "to vote in favor of the case going forward."[6]  See id. at 27.  That is why even the

18  "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  _____

25         [5] This point is underscored by Judge Burns's explanation to the Grand Jury that a
    magistrate judge will have determined the existence of probable cause "in most circumstances"
26  before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an
    imprimatur of finding probable cause in each case because had a magistrate judge not so found,
27  the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand
    Jury was informed that it merely was redundant to the magistrate court "in most circumstances."
28  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence
    presented.

### 2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present them evidence that tended to undercut probable cause. See Ex. A at 20.[7]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14,

---

[6] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, Judge Burns would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1    Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.

2    If there's something adverse or that cuts against the charge, you'll be informed of that.  They have

3    a duty to do that."  See id.  Thus, Judge Burns unequivocally advised the grand jurors that the

4    government would present any evidence that was "adverse" or "that cuts against the charge."  See

5    id.

6    **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers**
     **of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole**
7    **During Impanelment.**

8         The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions

9    given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.

10   While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of

11   adopting a highly formalistic

12   approach[8] to the problems posed by the instructions, endorsed many of the substantive arguments

13   raised by the defendants in those cases.  The district court's instructions cannot be reconciled with

14   the role of the grand jury as set forth in Navarro-Vargas II.  Taken together, the voir dire of and

15   instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas,

16   taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon

17   probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion.  That

18   is not the institution the Framers envisioned.  See United States v. Williams, 504 U.S. 36, 49 (1992).

19        For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-

20   Vargas II majority acknowledges that the two institutions perform similar functions: "'the public

21   prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs

22   much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v.

23   Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900

24   (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this

25   regard "is most accurately described as prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at

26

27         [7] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
28   majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
     imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand
     jury's constitutional independence.").

1   1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any

2   indictment or presentment returned by a grand jury, id., but also that "the grand jury has no

3   obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id.  See

4   Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal

5   Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably

6   . . . the most important attribute of grand jury review from the perspective of those who insisted that

7   a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

8   Procedure § 15.2(g) (2d ed. 1999)).

9        Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes

10  set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

11       The grand jury thus determines not only whether probable cause exists, but also
         whether to "charge a greater offense or a lesser offense; numerous counts or a single
12       count; and perhaps most significant of all, a capital offense or a non-capital offense --
         all on the basis of the same facts.  And, significantly, the grand jury may refuse to
13       return an indictment even "'where a conviction can be obtained.'"

14  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's

15  description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that

16  the grand jury "controls not only the initial decision to indict, but also significant questions such as

17  how many counts to charge and whether to charge a greater or lesser offense, including the important

18  decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge

19  Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the

20  majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor

21  has established probable cause that this individual has committed a crime." See id. at 1214

22  (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting);

23  United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

24  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth

25  Circuit.  But not in Judge Burns's instructions.

26  / / /

27  / / /

28  / / /

1  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion**
2  **Established in Both <u>Vasquez</u> and <u>Navarro-Vargas II</u>.**

3  The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the
4  grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its
5  previous decision in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand
6  jurors indict upon every finding of probable cause because the term "should" may mean "what is
7  probable or expected."  299 F.3d at 1164 (citation omitted).  That reading of the term "should"
8  makes no sense in context, as Judge Hawkins ably pointed out.  See <u>Navarro-Vargas II</u>, 408 F.3d at
9  1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to be
10 understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe
11 the grand jury's constitutional independence.").  <u>See also</u> <u>id</u>. ("The 'word' should is used to express
12 a duty [or] obligation.") (quoting <u>The Oxford American Diction and Language Guide</u> 1579 (1999)
13 (brackets in original)).

14 The debate about what the word "should" means is irrelevant here; the instructions here make
15 no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply
16 may not choose not to indict in the event of what appears to them to be an unfair application of the
17 law: should "you disagree with that judgment made by Congress, then your option is not to say 'well,
18 I'm going to vote against indicting even though I think that the evidence is sufficient'...."  <u>See</u> Ex.
19 A at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because they
20 disagree with a proposed prosecution. No grand juror would read this language as instructing, or
21 even allowing, him or her to assess "the need to indict."  <u>Vasquez</u>, 474 U.S. at 264.

22 While Judge Burns used the word "should" instead of "shall" during voir dire with respect
23 to whether an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, in context, it is
24 clear that Judge Burns could only mean "should" in the obligatory sense.  For example, when
25 addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there
26 is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate
27 and not indict." <u>See id</u>. at 8.  At least in context, it would strain credulity to suggest that Judge Burns
28 / / /

1  was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds

2  [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205.  Clearly Judge Burns was not.

3        The full passage cited above effectively eliminates any possibility that Judge Burns intended

4  the Navarro-Vargas spin on the word "should."

5        [T]he grand jury is determining really two factors: "do we have a reasonable belief
      that a crime was committed?  And second, do we have a reasonable belief that the

6        person that they propose that we indict committed the crime?"

7        If the answer is "yes" to both of those, then the case should move forward.  If the
      answer to either of the questions is "no," then the grand jury should not hesitate and

8        not indict.

9  See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially

10  states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have

11  intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See

12  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the

13  grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S.

14  338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination

15  whether there is probable cause and the protection of citizens against unfounded criminal

16  prosecutions.") (citation omitted).

17        By the same token, if Judge Burns said that "the case should move forward" if there is

18  probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable

19  cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns

20  would have to have intended two different meanings of the word "should" in the space of two

21  consecutive sentences.  That could not have been his intent.  But even if it were, no grand jury could

22  ever have had that understanding.[9]  Jurors are not presumed to be capable of sorting through

23  internally contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th

24  Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed

25  the correct one") (citation, internal quotations and brackets omitted).

26

27      [8] This argument does not turn on Mr. Arredondo-Ortiz' view that the Navarro-

28  Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.
Rather, it turns on the context in which the word is employed by Judge Burns in his unique
instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

08CR0801-WQH

1    Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it

2  explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

3        **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted

4  voir dire and excused a potential juror (CSW):

5        The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't
         want you to say, "Well, yeah, there's probable cause.  But I still don't like what the
6        government is doing.  I disagree with these laws, so I'm not going to vote for it to go
         forward."  If that's your frame of mind, then probably you shouldn't serve.  Only you
7        can tell me that.
         Prospective Juror: Well, I think I may fall in that category.
8        The Court: In the latter category?
         Prospective Juror: Yes.
9        The Court: Where it would be difficult for you to support a charge even if you
         thought the evidence warranted it?
10       Prospective Juror: Yes.
         The Court: I'm going to excuse you then.

11

12  See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a

13  prospective juror.  Even if the prospective juror did not like what the government was doing in a

14  particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote

15  that might prevent that.  See id. ("I wouldn't want you [to vote against such a case]").  The sanction

16  for the possibility of independent judgment was dismissal, a result that provided full deterrence of

17  that juror's discretion and secondary deterrence as to the exercise of discretion by any other

18  prospective grand juror.

19       **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear

20  that it there is an unbending obligation to indict if there is probable cause.  Grand jurors have no

21  other prerogative.

22  Court  . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."
         You'd have a similar *obligation* as a grand juror even though you might have to grit
23       your teeth on some cases.  Philosophically, if you were a member of Congress, you'd
         vote against, for example, criminalizing marijuana.  I don't know if that's it, but
24       you'd vote against criminalizing some drugs.

25       That's not what your *prerogative* is here.  Your prerogative instead is act like a judge
         and to say, "All right.  This is what I've got to deal with objectively.  Does it seem
26       to me that a crime was committed?  Yes.  Does it seem to me that this person's
         involved? It does."  *And then your obligation, if you find those things to be true,*
27       *would be to vote in favor of the case going forward*.

28  / / /

                                        21                        08CR0801-WQH

1  Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and

2  prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases

3  even though you were convinced there was probable cause they committed a drug offense?" Id. at

4  27.  The potential juror responded: "It would depend on the case." Id.  Nevertheless, that juror was

5  excused.  Id. at 28.  Again, in this context, and contrary to the situation in Navarro-Vargas, "should"

6  means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if

7  there is probable cause.

8         Moreover, as this example demonstrates, the issue is not limited to whether the grand jury

9  believes a particular law to be "unwise."  This juror said that any decision to indict would not depend

10  on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was

11  that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service.

12  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared

13  to indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue the question

14  of what factual scenarios troubled the prospective jurors, because his message is that there is no

15  discretion not to indict.

16         **(3)**    As if the preceding examples were not enough, Judge Burns continued to pound the

17  point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat

18  I have to insist on is that you follow the law that's given to us by the United States Congress.  We

19  enforce the federal laws here."  See id. at 61.

20         **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict

21  in every case where there was probable cause, Judge Burns reiterated that "should" means "shall"

22  when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even

23  though I think that the evidence is sufficient . . . .  Instead your *obligation* is . . . not to bring your

24  personal definition of what the law ought to be and try to impose that through applying it in a grand

25  jury setting."  See Ex. A at 9.

26         Moreover, Judge Burns advised the grand jurors that the were forbidden from considering

27  the penalties to which indicted persons may be subject.

28         Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the
         case is about because there is a disparity between state and federal law.
         The Court:  In what regard?

22                                                    08cr0801-WQH

1   Prospective Juror: Specifically, medical marijuana.
2   The Court: Well, those things -- the consequences of your determination shouldn't
    concern you in the sense that penalties or punishment, things like that -- *we tell trial*
    *jurors, of course, that they cannot consider the punishment or the consequence that*
3   *Congress has set for these things. We'd ask you to also abide by that.* We want you
    to make a business-like decision of whether there was a probable cause. ...

4   See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable

5   cause" would obviously leave no role for the consideration of penalty information.

6       The Ninth Circuit previously rejected a claim based upon the proscription against

7   consideration of penalty information based upon the same unlikely reading of the word "should"

8   employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).

9   Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in

10  passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning

11  in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.

12  The instructions again violate Vasquez, which plainly authorized consideration of penalty

13  information. See 474 U.S. at 263.

14      Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time

15  and time again that they had a duty, an obligation, and a singular prerogative to indict each and every

16  case where there was probable cause. These instructions go far beyond the holding of Navarro-

17  Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it

18  defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could

19  possibly believe what the Supreme Court held in Vasquez:

20      The grand jury does not determine only that probable cause exists to believe that a
        defendant committed a crime, or that it does not. In the hands of the grand jury lies
21      the power to charge a greater offense or a lesser offense; numerous counts or a single
        count; and perhaps most significant of all, a capital offense or a non-capital offense –
22      all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict
        in every case where a conviction can be obtained."
23

24  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly,

25  J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls

26  not only the initial decision to indict, but also significant decisions such as how many counts to

27  charge and whether to charge a greater or lesser offense, including the important decision whether

28  to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was

    empowered to assess the "the need to indict." See id. at 264. Judge Burns's grand jury is not

                                              23                              08CR0801-WQH

1  Vasquez's grand jury.  The instructions therefore represent structural constitutional error "that
2  interferes with the grand jury's independence and the integrity of the grand jury proceeding."  See
3  United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be
4  dismissed.  Id.

5       The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the
6  instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its
7  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its
8  decisions."  408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's
9  instructions may have on a grand jury because "it is the *structure* of the grand jury process and its
10 *function* that make it independent."  Id. at 1202 (emphases in the original).

11      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that
12 the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and
13 unreviewability of many of its decisions -- sufficiently protects that power."  See id. at 1214
14 (Hawkins, J., dissenting).  The flaw in the majority's analysis is that "[i]nstructing a grand jury that
15 it lacks power to do anything beyond making a probable cause determination ... unconstitutionally
16 undermines the very structural protections that the majority believes save[] the instruction."  Id.
17 After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'"
18 Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that "invariable assumption" were
19 to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez.  Indeed,
20 "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions
21 because nothing will happen if they disobey them."  Id.

22      In setting forth Judge Hawkins' views, Mr. Arredondo-Ortiz understands that Judge Burns
23 may not adopt them solely because the reasoning that supports them is so much more persuasive than
24 the majority's sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already
25 untenable reasoning.

26      Here, again, the question is not an obscure interpretation of the word "should", especially in
27 light of the instructions and commentary by Judge Burns during voir dire discussed above -
28 unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the

1  defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition

2  of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions.  Navarro-Vargas II is

3  distinguishable on that basis, but not only that.

4       Judge Burns did not limit itself to denying the grand jurors the power that Vasquez plainly

5  states they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth

6  Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that]

7  principle...."  See Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its

8  deliberations cannot embolden grand jurors who are no longer there, likely because they expressed

9  their willingness to act as the conscience of the community.  See Navarro-Vargas II, 408 F.3d at

10  1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to

11  protect the accused from the other branches of government by acting as the 'conscience of the

12  community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The

13  federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

14  jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

15  fashioned his own rules and enforced them.

**D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

16

17

18       In Williams, the defendant, although conceding that it was not required by the Fifth

19  Amendment, argued that the federal courts should exercise their supervisory power to order

20  prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure

21  required by Fifth Amendment common law.  See 504 U.S. at 45, 51.  Williams held that "as a

22  general matter at least, no such 'supervisory' judicial authority exists."  See id. at 47.  Indeed,

23  although the supervisory power may provide the authority "to dismiss an indictment because of

24  misconduct before the grand jury, at least where that misconduct amounts to a violation of one of

25  those 'few, clear rules which were carefully drafted and approved by Judge Burns and by Congress

26  to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve

27  as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id. at 47

28  (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

1    initiative, rules of grand jury procedure." Id. at 50.  As a consequence, Williams rejected the

2    defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.

3    See id. at 51-55.

4         Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors

5    would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

6         Now, again, this emphasizes the difference between the function of the grand jury
          and the trial jury.  You're all about probable cause.  If you think that there's evidence
7         out there that might cause you say "well, I don't think probable cause exists," then
          it's incumbent upon you to hear that evidence as well.  As I told you, in most
8         instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against
          what they may be asking you to do if they're aware of that evidence.*

9

10   Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and

11   their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear

12   in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters

13   presented to you."  See id. at 27.  The Ninth Circuit has already concluded it is likely this final

14   comment is "unnecessary."  See Navarro-Vargas, 408 F.3d at 1207.

15        This particular instruction has a devastating effect on the grand jury's protective powers,

16   particularly if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow

17   concluded was not conveyed by the previous instruction: "You're all about probable cause."  See Ex.

18   A at 20.  Thus, once again, the grand jury is reminded that they are limited to probable cause

19   determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had

20   already told the grand jurors that they likely would be excused if they rejected this limitation).  The

21   instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable

22   cause, but also advises the grand jurors that the prosecutor will present it.  The end result, then, is

23   that grand jurors should consider evidence that goes against probable cause, but, if none is presented

24   by the government, they can  presume that there is none.  After all, "in most instances, the U.S.

25   Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do

26   if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the

27   jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something

28   adverse or that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See

1  Ex. B at 14-15 (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would

2  have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the

3  U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act

4  in good faith in all matters presented to you."  <u>See</u> Ex. A at 27.

5       These instructions create a presumption that, in cases where the prosecutor does not present

6  exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which

7  no exculpatory evidence was presented, would proceed along these lines:

8            (1)   I have to consider evidence that undercuts probable cause.

9            (2)   The candid, honest, duty-bound prosecutor would, in good faith, have presented any

10                 such evidence to me, if it existed.

11           (3)   Because no such evidence was presented to me, I may conclude that there is none.

12  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

13  evidence presented represents the universe of all available exculpatory evidence; if there was more,

14  the duty-bound prosecutor would have presented it.

15      The instructions, therefore, discourage investigation -- if exculpatory evidence were out there,

16  the prosecutor would present it, so investigation is a waste of time -- and provide additional support

17  to every probable cause determination: i.e., this case may be weak, but I know that there is nothing

18  on the other side of the equation because it was not presented.  A grand jury so badly misguided is

19  no grand jury at all under the Fifth Amendment.

20                                            **IV.**
21  **THE COURT SHOULD SUPPRESS MR. RAMIREZ-LOZANO'S STATEMENTS
    PURSUANT TO MIRANDA AND 18 U.S.C. § 3501**

22      The government bears the burden of demonstrating that a defendant's statement is voluntary

23  and that <u>Miranda</u> warnings were given prior to a custodial interrogation.  <u>United States v. Harrison</u>,

24  34 F.3d 886, 890 (9th Cir. 1994); <u>see also</u> <u>United States v. Dickerson</u>, 530 U.S. 428, 439-41 (2000)

25  (discussing constitutional underpinnings of <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) and the

26  need to safeguard "precious Fifth Amendment rights"); <u>see also</u> 18 U.S.C. § 3501.  Unless and until

27  the government meets this high burden in this case, Mr. Lopez-Luz's statements must be suppressed.

28  / / /

1    Mr. Ramirez-Lozano anticipates that the Court may consider denying him an evidentiary

2 hearing on the ground that he has not filed a declaration in this case pursuant to Criminal Local Rule

3 47.1(g), which provides that a defendant must submit a declaration in support of his motion.

4 However, in this case, where it is the constitutionality of utilizing Mr. Ramirez-Lozano's statements

5 against him that is at stake and a declaration would require Mr. Ramirez-Lozano to make even *more*

6 statements, denying Mr. Ramirez-Lozano a hearing on this ground would violate his constitutional

7 rights.  It is well-settled that "Congress may not legislatively supercede [the Supreme Court's]

8 decisions interpreting and applying the Constitution." Dickerson v. United States, 530 U.S. 428, 437

9 (2000).  Since Miranda rests on a constitutional foundation, id. at 438, no law or local court rule can

10 constitutionally relieve the government of its burden to prove that Mr. Ramirez-Lozano voluntarily

11 waived the Miranda protections.  See id.  In light of the Supreme Court's decision in Dickerson, this

12 Court's burden-shifting local rule is unconstitutional, and therefore unenforceable.

13    Finally, this Court must make a factual determination as to whether a confession was

14 voluntarily given prior to its admission into evidence.  18 U.S.C. § 3501(a).  Where a factual

15 determination is required, courts are obligated by Federal Rule of Criminal Procedure 12 to make

16 factual findings.  See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because

17 "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v.

18 Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an

19 unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.  Mr. Lopez-

20 Luz requests an evidentiary hearing on this matter.

21                                              **V.**

22    **THIS COURT SHOULD GRANT LEAVE TO FILE FURTHER MOTIONS**

23    Mr. Ramirez-Lozano and defense counsel have received 137 pages of discovery in this case

24 and a DVD containing taped statements.  Defense counsel believes discovery is not yet complete.

25 Defense counsel requests leave to file further motions as new information comes to light.

26 / / /

27 / / /

28 / / /

1

## VI.

## <u>CONCLUSION</u>

For the reasons stated, Mr. Ramirez-Lozano requests that this Court grant her motions.

Respectfully submitted,

DATED:    April 9, 2008                    /s/ Carey D. Gorden

**CAREY D. GORDEN**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Ramirez-Lozano